## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michael S. Dietz, Trustee,

                    Plaintiff,

       v.

Erich L. Spangenberg, Audrey E.
Spangenberg, Christian Spangenberg, Stephen
Peary, FPX, LLC, FP Tech Holdings, LLC,
TechDev Holdings, LLC, Acclaim Financial
Group, LLC, NMPP, Inc. and Walter J. Gates,
III, P.A.,

                    Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 11-2600 ADM/JJG

---

Michael S. Dietz, Esq., Scott J. Hoss, Esq., John C. Beatty, Esq., and Christopher D. Nelson, Esq., Dunlap & Seeger, P.A., Rochester, MN, on behalf of Plaintiff.

Timothy R. Thornton, Esq., Kevin M. Decker, Esq., and Leah Ceee O. Boomsma, Esq., Briggs & Morgan, P.A., Minneapolis, MN, on behalf of Defendants Audrey E. Spangenberg; Christian Spangenberg; TechDev Holdings, LLC; and Acclaim Financial Group, LLC.

Michelle Kriedler Dove, Esq., and Lewis A. Remele, Esq., Bassford Remele, Minneapolis, MN, on behalf of Defendants Erich Spangenberg and NMPP, Inc.

Richard D. Anigian, Esq., Haynes and Boone, LLP, Dallas, TX, on behalf of Defendants FP Tech Holdings, LLC and FPX, LLC.

Elizabeth Wiley, Esq., The Wiley Law Firm PC, Austin, TX, on behalf of Defendant Stephen Peary.

Robert T. Kugler, Esq., Lara O. Glaesman, Esq., William Anders Folk, Esq., Peter J. Schwingler, Esq., and Todd A. Noteboom, Esq., Leonard Street and Deinard, P.A., Minneapolis, MN, on behalf of Defendants Audrey E. Spangenberg; Erich Spangenberg; Christian Spangenberg; FPX, LLC; FP Tech Holdings, LLC; TechDev Holdings, LLC; Acclaim Financial Group, LLC; NMPP, Inc.; and Stephen Peary.

Larry Ricke, Esq., and R. John Wells, Esq., Ricke & Sweeney, P.A., St. Paul, MN, on behalf of Defendant Walter J. Gates, III, P.A.

---

## I. INTRODUCTION

This matter is before the undersigned United States District Judge on the Defendants'

Objections [Docket No. 12, Attachs. 16, 17] to the following three orders issued on October 1,

2012, by United States Bankruptcy Judge Dennis D. O'Brien: Order Denying Motions for

Summary Judgment ("Summary Judgment Order") [Docket No. 12, Attach. 12]; Order Granting

Leave to Amend Complaint ("Leave to Amend Order") [Docket No. 12, Attach. 11]; and Order

to File Document Under Seal and Determination Regarding Attorney-Client Privilege ("Order

for Production of Documents") [Docket No. 12, Attach. 10] (collectively, "Bankruptcy Court

Orders").  The Bankruptcy Court Orders address non-core proceedings and are therefore

considered proposed findings of fact and conclusions of law.  28 U.S.C. 157(c)(1).[1]

Accordingly, this Court reviewed de novo those matters to which the Defendants have

specifically objected.  See id; Fed. R. Bankr. P. 9033.[2]

Based on this Court's de novo review, the Objection of Defendant Walter J. Gates, III,

P.A. ("WJG") [Docket No. 12, Attach. 16] is sustained, and the Objection of the remaining

Defendants [Docket No. 12, Attach. 17] is sustained in part and overruled in part.  As a result,

and for the reasons set forth below, the summary judgment motion of WJG [Docket No. 10,

Attach. 11] is granted, the summary judgment motion of the remaining Defendants [Docket No.

10, Attach. 12] is granted in part and denied in part, the summary judgment motion of the

Trustee [Docket No. 10, Attach 6] is denied; the Leave to Amend Order is modified; and the

---

[1] 28 U.S.C. § 157(c)(1) provides that in a non-core proceeding, "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court."

[2] Under 28 U.S.C. § 157(c)(1), "any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." Similarly, Fed. R. Bankr. P. 9033(d) requires a district judge to "make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made."

Order for Production of Documents is rejected as moot.

## II. BACKGROUND

This bankruptcy adversary proceeding arises out of a series of transactions in which Defendant FP Tech Holdings, LLC ("FP Tech") acquired all of the first-priority secured debt of Firepond, Inc. ("Firepond") from third-party note holders, declared a default and foreclosed on the debt, acquired all of Firepond's assets at the foreclosure sale, and transferred the assets to a newly formed company, Defendant FPX, LLC ("FPX"), which now operates as "FPX fired by Firepond."  At the time of the transactions, the chair of Firepond's board of directors, Audrey Spangenberg, was also the CEO of FP Tech and FPX.

Approximately nine weeks after the foreclosure sale, Firepond filed for Chapter 7 bankruptcy protection.  The Chapter 7 Trustee of Firepond's bankruptcy estate, Michael Dietz, has filed this adversary proceeding alleging claims for fraudulent transfer, preferential transfer, turnover, equitable subordination, breach of fiduciary duty, conversion, alter ego liability, and punitive damages.  Defendants deny any wrongdoing and argue that all of the claims fail because the Trustee is unable to prove injury to Firepond's unsecured creditors.

### A. Parties

Plaintiff Michael Dietz ("Trustee") is the Chapter 7 bankruptcy trustee for Firepond, which had operated as a publicly-traded Delaware corporation with its principal place of business in Mankato, Minnesota.  Am. Compl. [Bankr. Docket No. 172] ¶¶ 1, 30.[3]  Firepond's

---

[3] For clarity, "[Bankr. Docket No. _ ]" refers to the Bankruptcy Court's docket numbers in <u>Dietz v. Spangenberg</u>, 11-3074 (Bankr. D. Minn.).  The documents corresponding to the Bankruptcy Court's docket numbers are on file with this Court as docket numbers 5 through 12 (Transmittal of Adversary Proceedings), but the bankruptcy record is individually numbered and more easily identifiable.  Page numbers refer to the number in the ECF heading on each document.

business was developing and providing computer-based sales technology that permitted businesses to provide accurate, real-time price quotes for customized products.  Decl. of R. Kugler, Apr. 30, 2012 ("First Kugler Decl.") [Bankr. Docket No. 137, Attach. 13] Ex. 3 at 2-3.

Defendants Audrey and Erich Spangenberg are husband and wife.[4]  Am. Compl. ¶ 5. Defendant Christian Spangenberg is their son.  Id. ¶ 6.

Corporate Defendants Acclaim Financial Group, LLC ("AFG"), TechDev Holdings, LLC ("TechDev"), FP Tech, FPX, and NMPP, Inc. ("NMPP") are all Texas companies owned and managed by the Spangenbergs or their closely-held corporations.  See id. ¶¶ 8-16, 19-20.  AFG is a venture capital and private equity firm owned 99% by Audrey and 1% by Christian.  Id. ¶¶ 13-14.  AFG owns 100% of TechDev, which owns 99.5% of FP Tech, which in turn owns 100% of FPX.  Id.  Statement of Corporate Ownership [Bankr. Docket No. 27] at 1.  Audrey is the sole manager of FP Tech and FPX.  First Kugler Decl. Ex. 1 ("First Audrey Dep.") at 2-8.  NMPP is a strategic financial advisory firm owned and controlled by Erich that provides services to AFG and its affiliates through an advisory services contract.  Am. Compl. ¶ 16; Aff. of E. Spangenberg ("Erich Aff.") [Bankr. Docket No. 137, Attach. 1] ¶¶ 1, 4, 8, Ex. 1; First Kugler Decl. Ex. 2 at 21; First Audrey Dep. at 9.

Defendant Stephen Peary served as CFO of Firepond from the time Firepond was formed in 2005 until May of 2008.  Aff. of Stephen Peary ("Peary Aff.") [Bankr. Docket No. 137, Attach. 3] ¶ 2.  Thereafter, he served as Firepond's General Counsel until February 23, 2009, when he became the sole officer of Firepond.  Id. ¶ 3.  From approximately February 24, 2009, to August, 2010, Peary also served as General Counsel to FPX.  Id. ¶ 3.

---

[4] For ease of reference, Audrey, Erich, and Christian Spangenberg are hereafter referred to by their first names.

Throughout this adversary proceeding, the Spangenbergs, the corporate defendants owned and managed by them, and Peary have filed joint motions and briefs. Therefore, these Defendants will be collectively referred to here as the "Spangenberg Defendants."

Walter J. Gates, III, P.A. ("WJG") is a professional association located in Mankato, Minnesota. Am. Compl. ¶ 21. WJG conducted the February 23, 2009, foreclosure sale of Firepond's assets. Id. ¶¶ 147, 155.

## B. Timeline of Events

### 1. Firepond Issues Secured Notes in 2007

In January 2007, Firepond issued $5.6 million in senior secured convertible notes (the "CAP Notes") to approximately eleven institutional investors as part of a financial restructuring. See Peary Aff. Ex. 5 at 2. The CAP Notes were secured by a first-priority lien on all of Firepond's assets. Id.

In August 2007, Firepond obtained additional financing by issuing $3,337,500 in senior secured subordinated notes (the "Bridge Notes"). Id. The Bridge Notes were secured by a lien on all of Firepond's assets and were scheduled to mature on May 2, 2008. Id. at 3.

### 2. FP Tech is Formed and Invests in Firepond

FP Tech was formed on December 27, 2007, and Audrey was designated as its manager. Aff. of M. Dietz, Apr. 30, 2012 ("First Dietz Aff.") [Bankr. Docket No. 134] Ex. A at 3. A week after its formation, FP Tech purchased approximately 31% of Firepond's stock and two CAP Notes from Firepond investor Douglas Croxall and his affiliated entity, Jaguar Technology Holdings, LLC. Id. Ex. A3 at 21-26.

Thereafter, in February 2008, Erich, on behalf of FP Tech, contacted one of Firepond's

major note holders to propose a "plan that gives [Firepond] a chance and reflects proper treatment of the debt."  Decl. of R. Kugler, March 16, 2012 ("Second Kugler Decl.") [Bankr. Docket No. 113] Ex. C at 21.  Erich sought to "come to a consensus without the complication of involving 9 other holders" and asked that their communications remain confidential.  Id.

On April 17, 2008, FP Tech purchased CAP and Bridge Notes in the face amounts of $280,000 and $168,000, respectively, from Plexus Fund Limited for a total purchase price of $250,000.  See Peary Aff. Ex. 12 at 73-80.

### 3.  Firepond Issues Secured Exchanged Notes in April 2008 Financial Restructuring

By early 2008, it became clear that Firepond would default on the Bridge Notes when they matured on May 2, 2008, and Firepond therefore restructured its secured debt on April 24, 2008.  Pursuant to the financial restructuring, Firepond entered into an Amendment and Exchange Agreement (the "Exchange Agreement") with the holders of the CAP and Bridge Notes.  Peary Aff. Ex. 5 at 3-4.  Under the Exchange Agreement, the noteholders agreed to exchange the existing CAP and Bridge Notes for new notes (collectively, the "Exchanged Notes") with extended maturity dates of December 2009 and July 2009, respectively.  Id.  As with the original CAP and Bridge Notes, the Exchanged Notes were secured by a lien on all of Firepond's assets.  Id.

Under the terms of the Exchanged Notes, Firepond undertook a covenant to meet a minimum Consolidated EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) of negative $121,174 during the quarter ending December 31, 2008.  Peary Aff. Ex. 13 at 9, 36, Ex. 15 at 5, 26.  Stated more simply, Firepond agreed it would not lose more than $121,174 during the last quarter of 2008.  Failure to achieve the minimum Consolidated

EBITDA would constitute a default.  Id. Ex. 13 at 9, Ex. 15 at 5.  The Exchanged Notes provided that a default could be declared upon the delivery of default notices by holders of Exchanged Notes representing at least 30% of the aggregate debt owing under the Exchanged Notes.  Id. Ex. 13 at 9-10.

In conjunction with the issuance of the Exchanged Notes, Firepond executed a Collateral Security Agreement which appointed Bank of New York as the collateral agent ("Collateral Agent") responsible for overseeing the foreclosure process in the event of a default on the Exchanged Notes.  Peary Aff. Ex. 16 at 28-71 ("Collateral Security Agreement").  The Collateral Security Agreement provided that the collateral agent could be removed by holders of Exchanged Notes representing a majority of the aggregate amount of debt owing under the Exchanged Notes.  Collateral Security Agreement §§ 1(c); 10(b).  The Exchanged Notes and the Collateral Security Agreement specify they are governed by New York law.  Peary Aff. Ex. 13 at 24-25, Ex. 15 at 15, Ex. 16 at 46.

The financial restructuring also included an agreement by FP Tech to purchase $1.5 million in Firepond stock and to convert into equity approximately $400,000 in obligations Firepond owed FP Tech under the CAP Notes and under an equipment lease.  Id. Ex. 11 at 68-69.  Additionally, FP Tech had the option to purchase additional shares of Firepond stock in July 2008, which it exercised by purchasing $500,000 in shares.  Id. Ex. 25 at 49-97.

### 4.  Firepond Elects New Board Members, Appoints New President

Also in April 2008, Firepond's board of directors and management were changed to include a number of individuals associated with FP Tech and its affiliates.  The Exchange Agreement required Scott Kline and Francis Knuettel II to be appointed as board members.

Exchange Agreement § 7(t).  Kline and Knuettel had previously been recommended by FP Tech

in January of 2008, for service on Firepond's board.  Peary Aff. Ex. 11.  Audrey, FP Tech's

CEO, was also elected to Firepond's board and designated as the board's chair.[5]  Id. Ex. 18 at 15,

17.  Subsequent to the board meeting at which Audrey was elected, two Firepond board members

resigned, leaving Kline, Knuettel, and Audrey as Firepond's only board members.  Am. Compl.

¶¶ 67-68.

Thereafter, Firepond's board of directors appointed Bradlee Sheafe as the president of

Firepond.  Id. ¶ 71.  Sheafe simultaneously served as president of TechDev, the company which

owns FP Tech.  Id.

### 5. FP Tech Affiliate Adds Firepond's General Counsel to Payroll

In approximately June 2008, Peary began receiving monthly payments of $7,500 from

CWC, Holdings, LLC ("CWC"), an FP Tech affiliate.  First Kugler Decl. Ex. 5 at 8; First Dietz

Aff. Ex. B at 4; Aff. of M. Dietz, Feb. 27, 2012 ("Second Dietz Aff.") [Bankr. Docket No. 103]

Ex. M.  Peary avers the payments represented one half of his salary as Firepond's general

counsel, and that the payments were being made by an FP Tech affiliate pursuant to a "business

plan . . . to make Firepond['s] cash flow positive."  First Kugler Decl. Ex. 5 at 8.  However, in a

May 8, 2008 email from Erich to Peary, Erich stated he was winding down his management of

TechDev and was "recommending that [Peary] be made president/ manager of CWC Holdings at

a salary of $7,500 a month."  Second Dietz Aff. Ex. C.  Peary responded with an email thanking

Erich and Audrey and stating: "Being a part of the TechDev/CWC/Acclaim Financial team is an

---

[5] At the board meeting in which Audrey was elected, Peary noted that there was no apparent conflict of interest with her service on the board, and Audrey "stated that while representing the largest shareholder of the Company, her foremost responsibility as a director of the Company [was] to represent the interests of the stockholders as a whole."  Id. at 17.

honor." Id.

**6. FP Tech Begins Purchasing Exchanged Notes from Third Party Noteholders**

In July 2008, Erich, acting through NMPP and on FP Tech's behalf, continued his efforts to exert control over Firepond's debt. See Second Kugler Decl. Ex. N at 24-26, Ex. O at 28. Erich sought to persuade the institutional investors holding Exchanged Notes (the "Third Party Noteholders") to foreclose on the Exchanged Notes and invest in a new company that would take over Firepond's business operations. Erich Aff. Ex. 8 at 41. In October 2008, Erich tried to enlist a Third Party Noteholder to help him convince the other Third Party Noteholders to foreclose on the Exchanged Notes. Id. In stating his intent to foreclose, Erich stated: "I will be the ringleader—if you will be my elephant trainer." Id. As an alternative to persuading the Third Party Noteholders to agree to foreclose, FP Tech sought to purchase enough of Firepond's aggregate secured debt under the Exchanged Notes to hold the 30% of aggregate debt needed to declare a default and foreclose on its own. First Dietz Aff. Ex. B2 at 18.

During FP Tech's ongoing efforts to force consensus among Third Party Noteholders or to purchase their Exchanged Notes, Peary sent Erich an email offering his assistance, stating: "Let me know how I can help. Whether this turns into a heated process or a gentler approach, making lemonade out of lemons is the stuff I love." First Dietz Aff. Ex. B at 15. Erich responded, "You are in the game—I appreciate your help and give full credit to you when I talk to Audrey. I like working with you." Id. That same day, Peary informed Erich by email of a discussion between himself and a Third Party Noteholder. Id. at 14. Peary relayed his suspicion that the Third Party Noteholders had been in communication with each other and were "likely forming a unified front" against Erich's buyout attempts. Id. Erich responded, "Perfect—great

9

intel . . . thanks . . . .   It is always more fun when you kick the shit out of a 'unified group' than a group of banditos who are not unified."  <u>Id.</u>

### 7.  Firepond Drafts and Files Form 10-Q, Circulates Foreclosure Proposal

During the time he was negotiating with the Third Party Noteholders, Erich also assisted in drafting Firepond's Form 10-Q ("10Q"), to be filed with the SEC for the quarter ending September 30, 2008.  On November 11, 2008, Erich circulated an email to Peary, Audrey, Sheafe, and Firepond's CEO titled "Re: draft Firepond 10Q."  First Dietz Aff. Ex. B2 at 16.  In the email, Erich offered the following suggestion for Firepond's 10Q Report:  "MD&A . . . I would repeat all the bad stuff out of Note 1 . . . right up front . . . then tone down any optimism in the remaining MD&A [repeating all the bad stuff in future liquidity] Yep."  <u>Id.</u> (alterations in original).

In conjunction with drafting the 10Q, Erich suggested a "plan" to Peary.  Firepond would circulate a letter to its creditors, stating: "Attached is the 10Q of the Company for the quarter ended December 31, 2008.  As you will note under this document, the Company believes it will be in default as early as December 31, 2008 under the Exchanged . . . Notes.  Firepond desires to continue a dialogue that will preserve value for our relevant corporate constituencies . . . ."  Second Dietz Aff. Ex. I at 1.  Erich stated that after sending the letter, AFG would recommend a phone conference of senior creditors, circulate a term sheet, and then: "Come December 31— game over . . . Let me know your thoughts—I need to get clear on the game plan."  <u>Id.</u>

On November 12, 2008, Firepond filed its 10Q for the quarter ending September 30.  Second Kugler Decl. Ex. V at 1-28.  The 10Q stated: "Based on the current operational performance, the company believes it will not be able to comply with the financial covenants of

its senior indebtedness as of December 31, 2008." Id. at 9.

The next day, Erich sent an email to the Third Party Noteholders informing them that Firepond "filed its 10Q yesterday and announced that it will not meet the EBITDA covenant." First Dietz Aff. Ex. B at 7.  The email further stated that Firepond's subordinated secured debt and equity were "beyond impaired—they are worthless," and explained he had "been authorized by Firepond and FP Tech" to circulate a term sheet that proposed foreclosing on the Exchanged Notes and investing in a new, privately-held company.  Id.  Audrey received a courtesy copy of the email, which she forwarded to Firepond board member Knuettel on November 19.  Id. Knuettel responded: "Did we hear anything back from [Third Party Noteholders] Radcliff and/or JMG?"  Id.  Audrey replied: "Not yet, we are going to lob another email letting everyone know that Bankruptcy will be the next step . . . . "  Id.  Knuettel then replied, "[H]ow big a haircut are you offering to purchase?"  Id.  Audrey responded, "We would buy out either JP Morgan or Radcliffe['s Exchanged Notes] . . . at $0.20 . . . [Firepond's] stock is at $0.15."  Id.

On the day the 10Q was filed, FP Tech purchased the Exchanged Notes held by two additional institutional Third Party Noteholders.  Second Kugler Decl. Ex. M at 14-15, Ex. DD at 20-25.  On December 11, 2008, FP Tech purchased the Exchanged Notes held by an additional Third Party Noteholder.  Id. Ex. M at 16, Ex. EE at 26-32.  With these purchases, FP Tech held a sufficient percentage of the aggregate debt needed to declare a default under the senior Exchanged Notes and to replace the Collateral Agent under the Collateral Security Agreement.

### 8.  FP Tech Informs Collateral Agent of its Intent to Foreclose

On or about December 11, counsel for FP Tech contacted Bank of New York—the Collateral Agent responsible for overseeing the foreclosure process—to inform it of FP Tech's

intent to foreclose.  Additionally, Peary contacted the Bank of New York and informed it that,

from Firepond's perspective, "this is a friendly foreclosure."  First Dietz Aff. Ex. B at 19.  In

apprising Audrey of his conversations with Bank of New York's counsel, Peary stated that his

"biggest worry" was that Bank of New York would "put a strict reading to the CAP Note default

provision to conclude there can not be a default until after December 31.  So far no indication of

that, but it is a risk."  Id.

The next day, counsel for the Bank of New York asked Peary to provide it with

Firepond's Company Register ("Register") of Exchanged Note transfers in the preceding six

months.  First Dietz Aff. Ex. B at 22.  Peary informed Audrey and FP Tech's counsel that he

would "gin one up," and thereafter sent the Bank of New York an email that included as an

attachment a certified copy of Firepond's Register listing the names of all Exchanged Note

owners and the amount owed under each Note.  Id.; Peary Aff. Ex. 19 at 22-26.

### 9.  FP Tech Gives Firepond Notice of Default and Issues Press Release

On December 15, 2008, FP Tech sent Firepond a letter stating Firepond had defaulted

under the Exchanged Notes based on Firepond's admission in its 10Q that it would not meet the

minimum Consolidated EBITDA required under the Note.  Second Kugler Decl. Ex. GG at 4-5.

The letter further stated that, as a consequence of the default, all amounts due and owing under

the Exchanged Notes were immediately payable, and that FP Tech was entitled to foreclose on

the collateral securing the Note.  Id. at 5.

The same day, Audrey, in her role as FP Tech's CEO, sent a letter—drafted verbatim by

Erich—to Firepond's CFO stating that "AFG . . . now holds approximately 60% of the senior

secured debt of Firepond," and that "[c]ounsel for AFG has provided formal notice of

foreclosure to Firepond, Bank of New York, and Firepond's secured creditors." First Dietz Aff. Ex. B2 at 8. The letter further stated that "[a]ll this is unfortunate, but AFG believes the best plan is to eliminate all of the indebtedness of Firepond, reinvest in [a] new company [to be named FPX] and, in the process, save 40 very high paying jobs in Minnesota and continue to offer Firepond's customers its market-leading configuration, pricing and quoting [technology]." Id. The letter further informed that Sheafe, Firepond's president, would move to a board of director position with the new company. Id. at 9.

On December 17, 2008, FP Tech issued a press release that published the entire letter and announced AFG's delivery of the letter to Firepond. Id. at 8-9. The same day, Audrey reviewed a checklist of tasks and requirements pertaining to the formation of a new entity (FPX) that would take over Firepond's operations. Id. at 27-28.

**10. Outside Holders Respond to Default Notice**

After FP Tech issued the Notice of Default, a Third Party Noteholder contacted Peary to inform him they were "thinking about 'fighting' the process." Id. Ex. B at 26. Peary relayed the information to Erich and Audrey. Id. Erich responded: "I beg them to get in the ring with me." Id. Erich also sent separate emails to Audrey stating, "have u ever seen that movie . . . . . play tough . . . u may get sued, but sooooo what . . . ," and "F them . . . I will rock their world." Id. at 27-28.

The Third Party Noteholders retained counsel, who sent a letter to FP Tech's counsel demanding that FP Tech rescind the Notice of Default and "cease all efforts to take control of [Firepond] and its assets, for the sole benefit of FP Tech and its principals, and to the detriment of all other parties in interest." Peary Aff. Ex. 36 at 46. The Third Party Noteholders contended

13

the "so-called" default was not an actual default because Firepond had neither failed to make a payment nor violated a financial covenant under the Exchanged Notes.  Id. at 47.  Rather, FP Tech was asserting a <u>prospective</u> default based on the statement in Firepond's third quarter 10Q that it would not satisfy the Consolidated EBITDA covenant for the final quarter of 2008.  Id.

The Third Party Noteholders further stated FP Tech's principals were on both sides of the purported default.  Specifically, Audrey was the CEO of FP Tech, the company declaring the default.  She was also the Chairman of Firepond's board of directors, the board that bore "primary responsibility" for the statements in Firepond's 10Q that FP Tech was using as the basis for the default.  Id.  Additionally, FP Tech's president, who signed the 10Q, was to serve as a board member of the new company.  Id.

### 11.  Collateral Agent Refuses to Foreclose

Following FP Tech's Notice of Default, Bank of New York informed FP Tech's counsel that it would not proceed until FP Tech had provided Bank of New York with financial statements and sufficient indemnity to cover Bank of New York's costs, expenses, and liabilities which might be incurred in the foreclosure process.  First Dietz Aff. Ex. A at 29.  Bank of New York stated it did not intend to resign as Collateral Agent, but noted that the Collateral Security Agreement permitted the Collateral Agent to be removed upon the appointment of a successor collateral agent.  Id.

Thereafter, Peary, despite his position as <u>Firepond's</u> general counsel, sent an email to counsel for Bank of New York and counsel for FP Tech stating: "While I have not been asked to intercede here, [Bank of New York] is getting the indemnity they have asked for. . . . . Arrangement of other security is expensive and a waste of time.  FP Tech is part of a well funded

private group that does not care to share their financial reports with anyone."  Second Dietz Aff.

Ex. DD at 1.  Peary further stated: "Remember, this is a friendly foreclosure."  Id.

### 12.  FP Tech Issues Second Notice of Default

On January 5, 2009, Firepond's CFO certified that Firepond had failed to achieve the

minimum Consolidated EBITDA for the fiscal quarter ending December 31, 2008.  Aff. of M.

Dietz, March 19, 2012 ("Third Dietz Aff.") [Bankr. Docket No. 119] Ex. D at 18.  Thereafter, on

January 8, 2009, FP Tech's counsel sent Firepond a second Notice of Default asserting that an

event of default had occurred.  Id. at 23-24.  The Third Party Noteholders again responded,

asserting a default had not yet occurred because the applicable fiscal quarter had just ended, and

Firepond had not yet filed its 10Q for the fourth quarter with the SEC.  Id. at 19.  In a letter

addressed to Peary, the Third Party Noteholders contended the premature Notice of Default was

"evidence that the insiders of [Firepond] have conspired with FP Tech and its principals to

abscond with [Firepond's] assets."  Id.  They further expressed concern that "no disinterested

directors, unaffiliated with FP Tech and its principals," were protecting the interests of Firepond

and its creditors.  Id. at 20.  Firepond's outside counsel responded on January 12, 2009, with a

letter stating, "Ms. Spangenberg has recused herself from all deliberations on these matters."  Id.

at 5.

### 13.  FP Tech Replaces Collateral Agent with WJG

In late January 2009, FP Tech removed Bank of New York as Collateral Agent and

replaced it with WJG.  Aff. of W. Gates, III, Apr. 30, 2012 ("Gates Aff.") [Bankr. Docket No.

136] ¶¶ 5, 9.  Peary signed the removal documents on behalf of Firepond, and Audrey signed on

behalf of FP Tech.  Id. Ex. D at 114-22.

### 14.  Firepond Files Form 10-Q, Directs WJG to Foreclose

On February 4, 2009, Firepond filed its 10-Q Quarterly Report for the quarter ending December 31, 2008, with the SEC.  Decl. of R. Kugler, May 13, 2012 ("Third Kugler Decl.") [Bankr. Docket No. 144] Ex. 4 at 17-56.  The 10Q shows a Consolidated EBITDA of negative $595,487 for the quarter.  Id. at 21.

The same day, FP Tech, as the holder of a majority of Exchanged Notes, sent a letter to Walter Gates directing WJG to foreclose on Firepond's assets.  Gates Aff. ¶ 9, Ex. D at 110-13. Audrey signed the letter as "manager" of FP Tech.  Id. Ex. D at 113.

### 15.  FP Tech Purchases Remaining Notes

On February 9, 2009, FP Tech purchased the Exchanged Notes belonging to the four remaining Third Party Noteholders, thereby becoming the sole holder of all Exchanged Notes. First Dietz Aff. Ex. B2 at 29-35.  The total price of $2,327,562 was paid by FP Tech to purchase all Exchanged Notes with a face value of $9,158,430 from the Third Party Noteholders.  Second Kugler Decl. Ex. M at 10-22.

### 16.  WJG Conducts Foreclosure Sale at Which FP Tech is Sole Bidder

On February 12, 2009, WJG faxed a Notification of Disposition of Collateral to: Firepond; Firepond's secured, unsecured, and potential creditors; and counsel for FP Tech, Firepond, and Bank of New York.  See Gates Aff. Ex. F at 123-140.  The Notification provided the time, date, and location of the foreclosure sale and included a list of the Firepond assets to be sold.  Id.

WJG published notice of the foreclosure sale in the Wall Street Journal on February 13, 2009.  Gates Aff. ¶ 11, Ex. G at 141-42.  The notice provided the time, date, and location of the

sale and directed those who wished to obtain further information to contact WJG by phone.

WJG received three inquiries as a result of the ad.  Gates Aff. Ex. H ("Gates Dep.") at 146.

Prior to the foreclosure sale, Peary sent an email to Paul Grabitske, a Mankato attorney

who was assisting with the foreclosure process, asking whether FP Tech would need to present

Firepond's original senior secured notes in support of its bid.  First Dietz Aff. Ex. B at 38.

Grabitske responded that he did not think the notes would be needed at the auction, and that FP

Tech "may need to have them at closing, or arrange for the transfer at the time of closing (if that

is even necessary depending on the identity of the highest qualified bidder, which might be FP

Tech)."  Id.

On February 23, 2009, Walter Gates, on behalf of WJG, conducted the foreclosure sale at

Firepond's offices in Mankato.  Aff. of Larry B. Ricke ("Ricke Aff.") [Bankr. Docket No. 136]

Ex. C ("Second Audrey Dep.") at 92.  The only persons present at the sale were Audrey, Erich,

Gates, and Grabitske.  Second Audrey Dep. at 92; Gates Dep. at 146.  FP Tech's counsel

appeared by phone.  Second Audrey Dep. at 92.

FP Tech placed the sole bid at the foreclosure sale.  The record is unclear as to the

amount of the bid.  In his deposition testimony, Gates avers that at the sale, Audrey stated, "FP

Tech bids what's due and owing on the Notes," to which Gates replied: "[T]here being no other

bids, sold."  Gates Dep. at 146.  Gates avers that Audrey did not specify a dollar amount for the

bid but instead told Gates she "was going to figure out exactly what the bid was going to be."  Id.

at 147.  In contrast, Audrey's deposition testimony is that she bid a dollar amount that equated to

40% of the Exchanged Notes, for a total bid of approximately $3.5 million.  Second Audrey Dep.

at 92.

After Gates accepted the bid, Grabitske prepared the bill of sale with a blank space in the area designated for recording the consideration paid.  The partially-completed bill was then notarized by Grabitske and presented to Gates for his signature.  Id. at 92-93; Gates Dep. at 147. Gates signed the bill of sale and left without taking a copy with him.  Gates Dep. at 147; Peary Aff. Ex. 61 at 87 (Incomplete Bill of Sale).  Thereafter, Audrey avers she spoke with FP Tech's counsel by phone to determine the correct purchase price amount to record on the notarized bill of sale, and then completed the bill of sale by writing "$1,568,857. BRIDGE NOTES (40%)" and "$2,105,600 CAP NOTES (40%)" as the consideration paid.  Second Audrey Dep. at 93-94; Audrey Aff. [Bankr. Docket No. 137, Attach. 2] Ex. 11 at 46 (Completed Bill of Sale).  Two versions of the bill of sale have been submitted as evidence: one showing a sale price of 40% of the Exchanged Notes, and the other showing a blank space in the area designated for recording the sale price.

### 17.  FP Tech Transfers Assets to FPX

Immediately following the foreclosure sale, FP Tech transferred Firepond's assets to FPX.  First Kugler Decl. Ex. 7 ("Third Audrey Dep") at 6-7; First Dietz Aff. Ex. A2 at 12.  In describing how the assets were transferred from FP Tech to FPX, Audrey avers: "FP Tech immediately upon the close of the sale actually transferred the assets acquired to FPX . . . . [The assets] probably would have just gone right directly to FPX."  Second Audrey Dep. at 7. Similarly, Firepond's "cash went directly from Firepond to FPX."  Id. at 8.

On the day of the sale, a news release announced FPX's aquisition of Firepond and identified Audrey as the chair and CEO of FPX.  First Dietz Aff. Ex. A2 at 12.  The news release quoted Audrey as saying FPX had equity "in excess of $50 million" and no debt.  Id.  Audrey

further stated that "[e]xisting customers will not miss a beat—the entire operational team remains the same . . . ." Id.

**18.  Firepond Board and Management Resign, Execute Replacement Notes**

In conjunction with the February 23, 2009, foreclosure and sale of Firepond's assets, Firepond's president, Sheafe, and its CFO, Stelt, resigned from their positions with Firepond. Supp. Aff. of M. Dietz, May 14, 2012 ("Dietz Supp. Aff.") [Bankr. Docket No. 146] Ex. A at 3. The following month, on March 18, 2009, Peary sent an email to Stelt requesting him to execute replacement notes reflecting FP Tech's past purchases of Exchanged Notes from five Third Party Noteholders, and asking him to forward the documents to FP Tech after they had been executed. Id. Ex. B at 7.

On March 19, 2009, Peary circulated a Unanimous Written Consent form to Audrey, Kline, and Knuettel providing for their resignation from the Firepond board of directors effective February 23, the date of the foreclosure sale.  First Dietz Aff. Ex. B at 43.

**19.  Firepond Files Chapter 7 Bankruptcy**

On May 31, 2009, Firepond filed for Chapter 7 bankruptcy.  Firepond's bankruptcy schedules, verified by Peary, list FP Tech as a secured creditor owed $9,185,643.  Firepond's statement of financial affairs reflect Firepond was a party in three civil lawsuits concerning disputed fees and costs, including a dispute over legal fees owed by Firepond to a law firm.[6]

---

[6] Erich had attempted to negotiate a reduction of this debt on behalf of Firepond in July of 2008.  First Dietz Aff. Ex. B at 2.  At that time, a representative of the firm sent an email to Erich offering a reduction in the amounts owed by Firepond.  Id.  Erich forwarded the email to Audrey and Sheafe (president of Firepond and TechDev) stating, "Smart guy . . . I do not want to underestimate him . . . but I will [expletive] him and he will be thanking me in 30 days . . . ." Id. Firepond and the law firm were unable to agree on the amount owed, and Firepond began litigation with the law firm on September 22, 2008.  First Dietz Aff. Ex. C at 23.

On March 3, 2010, FP Tech filed a proof of claim in Firepond's bankruptcy case.  First Dietz Aff. Ex. I at 2.  The proof of claim asserts a secured claim of $9,185,643 based on the full face value of the Exchanged Notes, and an unsecured claim of $152,000 based on an equipment lease loan.  Id. at 2-3.

The Trustee filed this adversary proceeding in Bankruptcy Court on March 22, 2011.  All Defendants demanded a jury trial and the Bankruptcy Court transferred the adversary proceeding to this Court.  The transfer was determined to be premature, and the adversary proceeding was transferred back to the Bankruptcy Court until the case was trial ready.

**C.  Bankruptcy Court's Orders**

Summary judgment motions were filed in Bankruptcy Court by: (1) the Spangenberg Defendants, (2) WJG, and (3) the Trustee.  See Pl.'s Mot. Summ. J. [Bankr. Docket No. 133]; WJG's Mot. Summ. J. [Bankr. Docket No. 136]; Spangenberg Defs.' Mot. Summ. J. [Bankr. Docket No. 137].  All three motions were denied by Judge O'Brien, who determined that disputed issues of fact precluded summary judgment.  Summ. J. Order [Bankr. Docket No. 166] at 4.  The disputed fact issues identified include: whether the Spangenberg Defendants held a security interest in the collateral foreclosed upon by FP Tech; whether Firepond had actually defaulted at the time of the foreclosure; whether Firepond was damaged as a result of Defendants' actions; and whether the foreclosure sale was properly conducted.  Id. at 4-7.  In denying the summary judgment motions, Judge O'Brien stated that "to the extent [the summary judgment motions] involve related proceedings, this order constitutes a report and recommendation of denial."  Id. at 7.  Judge O'Brien issued a separate order transferring the adversary proceeding to this Court as "trial ready."  Order Transferring Proceeding, Oct. 1, 2012

[Bankr. Docket No. 167].

Contemporaneous with the summary judgment and transfer orders, Judge O'Brien also entered nondispositive orders granting then-pending motions by the Trustee: (1) to amend the Complaint to add veil piercing and punitive damages claims, and (2) to compel the production of documents that the Spangenberg Defendants had asserted were privileged.  See Leave to Amend Order [Bankr. Docket No. 165]; Order for Production of Documents [Bankr. Docket No. 164]. No factual or legal bases were provided for these rulings.

WJG and the Spangenberg Defendants filed Objections to the Summary Judgment Order and Leave to Amend Order.  See WJG Objection [Bankr. Docket No. 174]; Spangenberg Objection [Bankr. Docket No. 175].  The Spangenberg Defendants' Objection also included an objection to the Order for Production of Documents.  Following a dispute by the parties concerning the standard of review, if any, this Court should give the Bankruptcy Court's Summary Judgment Order, this Court ruled that the Summary Judgment Order constituted proposed findings of fact and conclusions of law to be reviewed de novo.  Order, March 8, 2013 [Docket No. 53].  The parties submitted supplemental briefing on the Objections and the matter was taken under advisement.

## III.  DISCUSSION

### A.  Standard of Review

A bankruptcy judge's proposed findings of fact and conclusions of law are reviewed de novo by the district judge as to those matters to which any party has timely and specifically objected.  28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033(d).  Defendants have timely and specifically objected to the Bankruptcy Court's proposed findings of fact and conclusions of law

recommending denial of Defendants' summary judgment motions.  The Trustee did not file an objection to the Bankruptcy Court's proposed findings of fact and conclusions of law.  Thus, this Court's de novo review will be limited to determining whether the Bankruptcy Court properly recommended denial of the Defendants' motions.

Rule 56(c) of the Federal Rules of Civil Procedure states a court shall grant summary judgment if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  Here, the Trustee is the nonmoving party, as the review is the Bankruptcy Court's recommended denial of Defendants' summary judgment motions.  If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate.  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (citations omitted).  However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . .  Instead, 'the dispute must be outcome determinative under prevailing law.'"  Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted).

**B.  Objections**

The Spangenberg Defendants argue the Bankruptcy Court's recommended denial of their summary judgment motions is erroneous because the Trustee cannot prove the Defendants' conduct harmed Firepond or its unsecured creditors.  The Spangenberg Defendants contend there is no genuine issue of material fact that: FP Tech owned all $9.2 million in secured Exchanged Notes at the time of the foreclosure sale; the Exchanged Notes were secured by all of Firepond's

assets; Firepond defaulted on the Exchanged Notes; Firepond's assets were worth less than $2 million at the time of the foreclosure sale; and FP Tech bid over $3.6 million in exchange for those assets.  The Spangenberg Defendants thus contend that the Trustee cannot prove any damage because Firepond's secured debt far exceeded the value of its assets.

WJG argues the Bankruptcy Court erred in denying its summary judgment motion on the conversion claim because, among other reasons, WJG's actions were lawfully justified under the Exchanged Notes and Collateral Security Agreement.

The Trustee responds that FP Tech did not hold the Exchanged Notes because those Notes had not been reissued to FP Tech at the time of the foreclosure sale.  He also argues Firepond was harmed when a valuable patent license was transferred to FP Tech in the foreclosure, and that Firepond was also harmed because Defendants' wrongful conduct caused it to go from an operating entity with a going concern value to a valueless shell corporation.  The Trustee further contends Defendants converted Firepond's assets because Defendants had no legal right to foreclose and paid nothing for the assets at the foreclosure sale.

The Court will first address the disputes over ownership of the Exchanged Notes and the value of the patent license, and then analyze the remaining Objections as they relate to each of the Trustee's claims.

### 1. Ownership of Exchanged Notes

Whether FP Tech was the holder of the Exchanged Notes at the time of the foreclosure sale requires interpretation of the Sections 3(c)(iii) and 18 of the Exchanged Notes, which address the transfer, sale, or assignment of the Notes.  The Trustee contends that under Section 18, the transfer of an Exchanged Note becomes effective only when the original Note is

surrendered and a replacement Note is issued.  Section 18 provides in relevant part:

> If this Note is to be transferred, the Holder shall surrender this Note to the Company, whereupon the Company will forthwith issue and deliver upon the written order of the Holder a new Note . . . registered in the Company's Register of Notes as the Holder may request in writing, representing the outstanding Principal being transferred by the Holder . . . .

First Dietz Aff. Ex. B3 at 27.  The Trustee argues Firepond had not reissued and delivered replacement Notes to FP Tech by the time of the foreclosure sale.  Thus, the Exchanged Notes had not transferred to FP Tech before the sale was conducted.  The Trustee therefore contends FP Tech did not own the Exchanged Notes when it acquired Firepond's assets at the foreclosure sale.

The Spangenberg Defendants argue that Section 18 merely specifies the procedure for reissuing Notes *after* secured rights have been transferred, and the provision does not suggest creditor rights "languish in limbo" pending the issuance of replacement Notes.  Defs.' Reply to Trustee's Supp. Mem. [Docket No. 61] at 4.  The Spangenberg Defendants insist Section 3(c)(iii), not Section 18, governs how ownership of assigned Notes is to be determined.  Section 3(c)(iii) states in pertinent part:

> The Company shall maintain a register (the "Register") for the recordation of the names and addresses of the holders of each Note and the principal amount of the Notes held by such holders (the "Registered Notes").  The entries in the Register shall be conclusive and binding for all purposes absent manifest error.  The Company and the holders of the Notes shall treat each Person whose name is recorded in the Register as the owner of a Note for all purposes, including, without limitation, the right to receive payments of Principal and Interest hereunder, notwithstanding notice to the contrary.  A Registered Note may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register.  Upon its receipt of a request to assign or sell all or part of any Registered Note by a Holder, the Company shall record the

24

> information contained therein in the Register and issue one or more
> new Registered Notes in the same aggregate principal amount as the
> principal amount of the surrendered Registered Note to the
> designated assignee or transferee pursuant to Section 18.

First Dietz Aff. Ex. B3 at 11.

As the text of the two provisions demonstrate, Section 3(c)(iii) unambiguously governs the determination of Note ownership, whereas Section 18 provides the procedure for issuing replacement Notes once the Exchanged Notes have been assigned.  The text of Section 3(c)(iii) specifically addresses Note ownership, stating: "The Company and the holders of the Notes shall treat each Person whose name is recorded in the Register as the owner of a Note for all purposes, including, without limitation, the right to receive payments of Principal and Interest hereunder, nothwithstanding notice to the contrary."  Id. (emphasis added).  Moreover, while Section (3)(iii) provides that the Register must be updated and a new Note issued when a Note is sold, the provision explicitly states that the Register (not the reissuance of the Notes) determines Note ownership.  See id. ("The entries in the Register shall be conclusive and binding for all purposes absent manifest error. . . . [The] Person whose name is recorded in the Register [i]s the owner of a Note for all purposes. . . . A Registered Note may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register.").  In contrast, Section 18 lacks any language pertaining to the determination of Note ownership.

Defendants have adduced documentary and testimonial evidence establishing that the Register maintained by Firepond listed FP Tech as the owner of all of the secured Notes at the time of the foreclosure sale.  See Peary Aff. Exs. 19-23 (showing periodical updates to Register); Peary Aff. ¶¶ 23-25 (averring he maintained Register); Dietz Aff. Ex. H (Peary § 341 Meeting Testimony) at 48 (testifying "[w]e kept a note register towards the end . . .").

The Trustee challenges the authenticity of the Register and argues it is not binding due to the existence of "manifest error."  The Trustee contends manifest error exists because the Register produced by the Spangenberg Defendants is not the original register; rather, it was "ginned up" by Peary to replace the original, which may have been in the possession of the former Collateral Agent, Bank of New York.  See First Dietz Aff. Ex. B at 22.  The Bankruptcy Court agreed with the Trustee and denied summary judgment on the issue of Note ownership because "Peary's credibility is very much in issue."  Summary Judgment Order at 5 n.4.

However, Peary's testimony at the § 341 Meeting of Creditors that he maintained a company Register during 2008 is corroborated by the December 15, 2008 email Peary sent to Bank of New York that includes Firepond's Register as an attachment.  See Peary Aff. Ex. 19 at 22-26.  Additionally, though it is uncertain whether the Register produced by Defendants is the original register or a recreated register, there is no evidence that it is inaccurate: the information in the Register is corroborated by wire transfer records reflecting FP Tech's purchase of the Exchanged Notes from Third Party Noteholders, and no one other than FP Tech has claimed ownership to the Notes.  See Audrey Aff. Exs. 2-3.

Further, Peary's testimony as to the existence and accuracy of the Register is corroborated by contemporaneous documents and is unrebutted by the Trustee.  A litigant challenging an affiant's credibility must produce "specific facts" that would raise an issue for trial, for if "an affiant's credibility is always an issue for the trial court, then the granting of summary judgment would be virtually impossible when it is based in any way upon an affidavit."  Lundeen v. Cordner, 354 F.2d 401, 409 (8th Cir. 1966).  Here, the Trustee has produced no specific facts to show the Register did not exist or that it included "manifest error"

at the time of the foreclosure sale.  Accordingly, the unambiguous Exchanged Note provisions

and the unrebutted and corroborated evidence establish for summary judgment purposes that FP

Tech was the holder of each of the Notes at the time of the foreclosure sale.  See Nycal Corp. v.

Inoco PLC, 988 F. Supp. 296, 299 (S.D.N.Y. 1997) (stating that under New York law, a court

may properly decide a contract interpretation dispute on summary judgment when the contract

language is unambiguous); Peary Aff. Ex. 13 at 24-25, Ex. 15 at 15 (stating Exchanged Notes are

governed by New York law).

### 2.  Value of the Patent License

The Trustee contends Firepond was harmed when a patent license allegedly worth $13

million was transferred from Firepond to FP Tech in the foreclosure sale.  The license is for the

use of Patent 7,606,739 (the "'739 Patent"), which is owned by a Spangenberg entity CWC.

First Dietz Aff. Ex. I at 12.  CWC has obtained judgments against third parties for infringement

of the '739 Patent, including a judgment against Hyundai Motor America ("Hyundai") for more

than $13 million.  Id. at 10-11.  The Trustee asserts third parties such as Hyundai would have

paid considerable value for Firepond's patent license in order to avoid infringement liability

under the '739 Patent.

This argument lacks merit because the agreement granting the non-exclusive patent

license to Firepond expressly states that the license is not transferrable or assignable without the

consent of the licensor.  See First Dietz Aff. Ex. B3 (Patent License Agreement) ¶¶ 1, 10.1.  In

other words, the license rights owned by Firepond were unassignable rights.  Under the terms of

the license agreement, any attempt by Firepond to assign the patent license without CWC's

consent would have caused the license rights to be void.  Id. ¶ 10.1 ("Any assignment by

Licensor shall be void, deemed a material breach of this Agreement and result in the immediate termination of this Agreement.").  Thus, the patent license had no sale value to Firepond.

Additionally, the patent license would have had no value to Firepond's bankruptcy estate. Section 365(c) of the Bankruptcy Code bars a bankruptcy trustee from assuming and assigning a non-exclusive patent license without the licensor's consent.  See Everex Sys., Inc. v. Cadtrak Corp., 89 F.3d 673, 680 (9th Cir. 1996) ("Because federal law governs the assignability of nonexclusive patent licenses, and because federal law makes such licenses personal and assignable only with the consent of the licensor, the . . . license is not assumable and assignable in bankruptcy under 11 U.S.C. § 365(c)."); In re Golden Books Family Entm't, Inc., 269 B.R. 300, 310 (Bankr. D. Del. 2001) (stating nonexclusive patent licenses may not be assigned under 11 U.S.C. § 365(c) absent licensor's consent).

## C.  Claims

Having determined these preliminary issues, this Court will next analyze each of the Trustee's claims to determine whether the Bankruptcy Court's recommended denial of the Defendants' summary judgment motions was correct.

### 1.  Count I: Fraudulent Transfer

The Trustee seeks to set aside the following transfers as fraudulent transfers under § 548 of the Bankruptcy Code: 1) FP Tech's acquisition of each of the Exchanged Notes, and 2) the foreclosure sale.  Am. Compl. ¶¶ 186-201.

Section 548 provides in relevant part:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . .

11 U.S.C. § 548(a)(1).

### a. FP Tech's Acquisition of the Exchanged Notes

Under the express language of § 548(a)(1), FP Tech's acquisition of the Exchanged Notes is not avoidable as a fraudulent transfer because the transfers do not constitute an "obligation . . . incurred by the debtor . . . ."  11 U.S.C. § 548(a)(1).  The transfers of the Exchanged Notes from the Third Party Noteholders to FP Tech did not cause Firepond to incur new obligations; rather, the transfers merely changed the identity of the payees under Firepond's existing obligations.  Therefore, the Trustee's fraudulent transfer claim fails as to FP Tech's acquisition of the Exchanged Notes from the Third Party Noteholders, and the Spangenberg Defendants are entitled to summary judgment on this claim.

### b. Foreclosure Sale

The Trustee seeks to avoid the foreclosure sale as an actually fraudulent transfer under § 548(a)(1)(A), as well as a constructively fraudulent transfer under § 548(a)(1)(B).

### i. Section 548(a)(1)(A): Actual Fraud

A transfer is avoidable under § 548(a)(1)(A) if the debtor "made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . .

29

indebted." 11 U.S.C. § 548(a)(1)(A).  The law recognizes the unlikelihood of being able to produce sufficient direct evidence to establish a debtor's intent to defraud creditors.  Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir. 1998).  Therefore, courts look for common indicators of fraudulent intent, or "badges of fraud," to demonstrate fraudulent intent, including: (1) actual or threatened litigation against the debtor; (2) a transfer of all or substantially all of the debtor's property; (3) insolvency of the debtor; (4) a special relationship between the debtor and transferee; and (5) retention of the property by the debtor after the transfer.  Id.  If a trustee establishes the existence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent, and the burden of proof shifts to the transferee to prove a legitimate supervening purpose for the transfers.  Id.

Here, the evidence suffices to establish the existence of multiple badges of fraud.  First, it is undisputed that Firepond was engaged in litigation with three of its creditors at the time of the foreclosure sale.  Second, all of Firepond's assets were transferred in the foreclosure sale.  Third, Firepond was insolvent at the time of the sale.  Fourth, the debtor had a number of special relationships with FP Tech, the transferee.  Audrey, the chair of Firepond's board, was also the CEO of FP Tech.  Firepond's remaining board members, Kline and Knuettel, had been recommended by FP Tech.  Firepond's purported advisor, NMPP, was also an advisor to FP Tech.  Firepond's general counsel, Peary, received half of his salary from an FP Tech affiliate.  Firepond's president, Sheafe, was also the president of an FP Tech affiliate.  As to the fifth badge of fraud, Firepond's former business operates in the same location with the same operational team, but under the Spangenberg's newly-formed entity, FPX.

The Spangenberg Defendants argue the foreclosure sale was based on a legitimate

supervening purpose because Firepond had defaulted under the terms of the Exchange Notes, which entitled FP Tech to foreclose on the collateral. However, a collusive foreclosure sale is subject to attack under § 548(a)(1). BFP v. Resolution Trust Corp., 511 U.S. 531, 545 (1994). Here, the Trustee has adduced sufficient evidence to raise a genuine fact issue of whether the foreclosure sale was collusive. Erich's emails repeatedly reference a "plan" or "game plan" by FP Tech with respect to Firepond. When Peary asks Erich to let him know how he can help, Erich responds that he is "in the game." Audrey and Peary (Firepond's director and general counsel), allowed Erich (FP Tech's advisor) to dictate gratuitous, extraneous statements in Firepond's 10Q emphasizing Firepond's dire financial condition. These statements were then used by FP Tech to negotiate more favorable prices for the purchase of Firepond's secured debt from the Third Party Noteholders. Through those negotiations, FP Tech acquired a sufficient percentage of the aggregate amount of debt owed under the Exchanged Notes to declare a default against Firepond.

Firepond's failure to object to FP Tech's premature declarations of default is also evidence that the foreclosure sale may have been collusive. Indeed, Peary was worried that Bank of New York would place a strict reading on the default provisions of the Exchanged Notes. Moreover, Peary, a Firepond officer, characterized the foreclosure as a "friendly foreclosure" and assisted in removing Bank of New York as Collateral Agent after Bank of New York requested financial statements from FP Tech.

The Spangenberg Defendants next argue that even if the Trustee could show the requisite intent under § 548(a)(1)(A), the fraudulent transfer claim must nevertheless fail because Firepond's secured debt greatly exceeded its assets at the time of the foreclosure sale, and thus

unsecured creditors had no prospect for recovery.  However, the Eighth Circuit has stated that

"under § 548(a)(1), actual harm is not required; the trustee must show only that the debtor acted

with the intent to hinder, delay or defraud creditors."  <u>Sherman v. Third Nat'l Bank</u>, 67 F.3d

1348, 1355 n.6 (8th Cir. 1995); <u>see also</u> <u>Tavenner v. Smoot</u>, 257 F.3d 401, 407 (4th Cir. 2001)

("[I]f a debtor enters into a transaction with the express purpose of defrauding his creditors, his

behavior should not be excused simply because, despite the debtor's best efforts, the transaction

failed to harm any creditor.").

### ii.  Section 548(a)(1)(B): Constructive Fraud

A fraudulent transfer claim under the constructive fraud standard of § 548(a)(1)(B) will

succeed if a trustee can show the debtor "received less than a reasonably equivalent value in

exchange for [a] transfer" and "was insolvent on the date [the] transfer was made . . . ."  11

U.S.C. § 548(a)(1)(B)(i)-(ii)(I).  "Value" under § 548 includes satisfaction of a present or

antecedent debt of the debtor.  11 U.S.C. § 548(d)(2)(A).

The parties agree that Firepond was insolvent on the date of the foreclosure sale.  Thus,

the determinative issue is whether Firepond received reasonably equivalent value for its assets at

the foreclosure sale.  The evidence raises a genuine factual dispute as to what consideration, if

any, FP Tech offered at the foreclosure sale.  The record includes two different versions of the

notarized bill of sale from the foreclosure sale.  One version shows FP Tech paid 40% of amount

owing on the Exchanged Notes, for an approximate total of $3.6 million.  The second version

shows nothing was paid, as there is a blank space on the bill of sale for recording the

consideration paid.  Additionally, the proof of claim signed by Audrey and filed by FP Tech in

Firepond's bankruptcy case seeks the entire amount owing under the Notes, further implying no

credit bid had been made by FP Tech at the foreclosure sale, as a credit bid would have extinguished a corresponding amount of the debt owed to FP Tech.[7]  Firepond's bankruptcy schedules also list the full amount of the Exchanged Notes as the amount of debt owed by Firepond to FP Tech.  Viewing this evidence in the light most favorable to the Trustee, a reasonable juror could conclude that FP Tech did not give reasonably equivalent value at the foreclosure sale.

### c. Christian Spangenberg

The Spangenberg Defendants also object to the Bankruptcy Court's denial of summary judgment as to Christian Spangenberg on the fraudulent transfer claim.  They argue Christian was a minor child at all relevant times, and that the Trustee has produced no evidence that he was involved in any of the events at issue in this adversary proceeding.

The Trustee seeks to recover the value of Firepond's assets from Christian solely on the basis that any benefit to FP Tech resulting from the asset transfer accrues to Christian by virtue of his 1% ownership interest in AFG.  See Am. Compl. ¶¶ 176-178, 190, 200.  Under section § 550(a) of the Bankruptcy Code, a trustee can recover a fraudulent transfer from the initial transferee or from "the entity for whose benefit such transfer was made."  11 U.S.C. § 550(a).  However, "[n]othing in section 550(a)(1) indicates that corporate form can be thrust aside and all voidable transfers to a corporation recovered from its shareholders on the mere assumption that shareholders somehow automatically 'benefit' from such transfers."  Schechter v. 5841 Bldg. Corp., 341 B.R. 638, 645 (Bankr. N.D. Ill. 2006).  Most cases in which shareholders have been

---

[7] The Spangenberg Defendants argue the proof of claim is immaterial, as FP Tech is bound by its credit bid.  However, the Proof of Claim, signed by Audrey, evinces her view of what is owed under the Exchanged Notes.  Her state of mind is relevant as to the amount of the credit bid, if any, she placed at the foreclosure sale.

found liable as beneficiary of corporate transfers involve some showing of veil-piercing.  Id. at

646.  Here, the Trustee has neither alleged nor adduced evidence that FP Tech was Christian's

alter ego or mere instrumentality, or that he abused the corporate form.  Indeed, the Summary

Judgment Order states that the "record is not clear who Christian Spangenberg is or why he is a

defendant."  Summary Judgment Order at 3.  Accordingly, the Spangenberg Defendants'

objection as to Christian is sustained, and summary judgment is granted in favor of Christian on

the fraudulent transfer claim.  Summary judgment on the fraudulent transfer claim as to the

remaining Spangenberg Defendants is denied.

### 2. Count II: Preferential Transfer

The Trustee also seeks to avoid the foreclosure sale as a preferential transfer under § 547

of the Bankruptcy Code.  That provision states in relevant part:

> [T]he trustee may avoid any transfer of an interest of the debtor in property--
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made--
>
> > (A) on or within 90 days before the date of the filing of the petition; or
> >
> > (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if --

34

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The Spangenberg Defendants argue the Trustee cannot satisfy the fifth element because FP Tech's $9.2 million lien under the Exchange Notes greatly exceeded the value of Firepond's assets, which the Trustee admits totaled no more than $1.9 million without the patent license. The Spangenberg Defendants argue FP Tech did not receive more in the foreclosure sale than it would have been entitled to receive under a Chapter 7 liquidation.  The Trustee's only response is that the fifth element is satisfied because FP Tech did not own the Exchange Notes at the time of the sale.  However, as previously discussed, FP Tech has been found to be the owner of the Exchanged Notes based on Firepond's Register.  Thus, summary judgment is granted to the Spangenberg Defendants on the Trustee's preferential transfer claim.  See In re Powerline Oil Co., 59 F.3d 969, 972 (9th Cir. 1995) (stating pre-petition payments to secured creditor generally not preferential because "creditor would not receive more than in a chapter 7 liquidation").[8]

### 3.  Count III: Turnover

The Trustee's turnover claim is based on his allegation that the foreclosure sale was not conducted in a commercially reasonable manner, and that as a result the sale was invalid and Firepond's assets remain property of the bankruptcy estate.  Am. Compl. ¶¶ 214-220.  Section

---

[8] Conceivably, the fifth element for a preferential transfer would be met if FP Tech is ultimately determined to have engaged in inequitable conduct that would justify subordinating its secured claim to the claims of unsecured creditors.  However, the Trustee has not raised this argument, so it will not be considered here.

542 of the Bankruptcy Code requires an entity in possession or control of estate property to deliver (or "turn over") the property or the value of the property to the trustee unless the property is of inconsequential value or benefit to the estate.  See 11 U.S.C. § 542(a).  Turnover is not applicable where the ownership of assets is in dispute.  United States v. Inslaw, Inc., 932 F.2d 1467, 1472 (D.C. Cir. 1991) ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute.").  Here, the Spangenberg Defendants strongly dispute the Trustee's assertions that the foreclosure sale was not commercially reasonable and that Firepond retained ownership of the assets following the sale.  Thus, the Bankruptcy Code's turnover provision does not apply, and the Spangenberg Defendants are granted summary judgment on this claim.

### 4.  Count IV: Equitable Subordination

The Trustee also asserts a claim against the Spangenberg Defendants for inequitable subordination under § 510 of the Bankruptcy Code.  Am. Compl. ¶¶ 221-45.  The Trustee contends that, to the extent FP Tech may be deemed to hold a secured claim in Firepond's bankruptcy proceeding, the claim should be subordinated to the claims of unsecured creditors, and FP Tech's security interest should be transferred to the bankruptcy estate.  Id. ¶¶ 243-44. The Trustee also seeks to subordinate the Spangenberg Defendants' interest in common stock of Firepond to the interests of non-defendant common stock holders.  Id. ¶ 245.

Section 510(c) allows a court to use principles of equitable subordination to: (1) subordinate one claim to another for purposes of distribution, or (2) order that any lien securing a subordinated claim be transferred to the bankruptcy estate.  11 U.S.C. § 510(c).  Equitable subordination is appropriate where: (1) a claimant has engaged in inequitable conduct; (2) the

misconduct resulted in injury to the bankrupt's creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code.  In re M&S Grading, Inc., 541 F.3d 859, 866 (8th Cir. 2008).  When a claimant is an insider of the debtor, the claimant's conduct "is closely scrutinized, and the trustee need prove only that [the claimant] breached a fiduciary duty or engaged in conduct that is somehow unfair."  Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.), 850 F.2d 1275, 1282 n.13 (8th Cir. 1988).

The Spangenberg Defendants argue they are entitled to summary judgment on the inequitable subordination claim because Firepond's assets were worth substantially less than FP Tech's lien at the time of the foreclosure sale, and thus unsecured creditors were not injured by the foreclosure.  The inequitable conduct alleged by the Trustee, however, is not limited to the foreclosure sale alone.  The Trustee also alleges that FP Tech contributed to the uncertainty of Firepond's debt structure, improperly acquired Firepond's secured debt, issued premature declarations of default on the debt, and subsequently foreclosed on the debt.  Am. Compl. ¶¶ 230-36.  The Trustee further alleges the Spangenberg Defendants foreclosed on Firepond's secured debt for the express purpose of eliminating the interests of unsecured creditors and equity holders and continuing Firepond's core business through a new entity.  Id. ¶ 240.  Thus, for the purpose of assessing injury, Firepond's value should be measured as of the date the Spangenberg Defendants first commenced their alleged plan, rather than when the alleged plan was nearly completed.  See, e.g., Pepper v. Litton, 308 U.S. 295, 312 (1939) ("The [foreclosure] sale cannot be taken as an isolated step unconnected with the long antecedent events, all designed to defeat creditors.").

The Trustee contends that Firepond's value on the date the plan began can be determined by referencing the price at which Firepond's publicly-traded stock sold on that day. The price of an actively traded stock in a liquid market reflects the value placed on a firm by many professional investors who follow the firm closely. Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 835 (7th Cir. 1985). The stock price in a liquid market is "presumptively one to use in judicial proceedings." Id. The Trustee has produced a list of Firepond's daily values for its publicly-traded stock during the relevant time period. First Dietz Aff. Ex I at 13-14. These values are evidence that Firepond may have had a positive net value at the time FP Tech's alleged plan began. Therefore, a genuine dispute of fact exists as to whether creditors were injured by the Spangenberg Defendants' allegedly inequitable conduct.

The Spangenberg Defendants also argue the equitable subordination claim lacks merit because the Trustee cannot prove FP Tech engaged in inequitable conduct. Inequitable conduct occurs where a claimant "violat[es] the rules of fair play and good conscience." Pepper, 308 U.S. at 310. One who is a fiduciary:

> cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. . . . Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.

Id. at 311.

Here, the evidence adduced by the Trustee raises genuine issues of fact as to whether FP Tech, Audrey, Peary, Erich, and NMPP engaged in inequitable conduct by utilizing Audrey and Peary's powers as fiduciaries of Firepond for their personal advantage. Specifically, insiders

38

Audrey and Peary were responsible for statements in Firepond's 10Q that were used by FP Tech to advance its foreclosure plan to Third Party Noteholders, reduce the price FP Tech paid to purchase Exchanged Notes, and prematurely declare defaults on the Exchanged Notes.

There is evidence that Erich recommended emphasizing negative information and "toning down" optimism in the 10Q. Second Dietz Aff. Ex. I at 1. He also suggested a "plan" for negotiating with the Third Party Noteholders based on the statement in the third quarter 10Q that Firepond believed it would default on the Exchanged Notes as early as December 31, 2008. Erich laid out the timing and content for how Firepond and AFG would communicate news of the 10Q to the Third Party Noteholders and concluded by stating: "Come December 31— game over . . . Let me know your thoughts—I need to get clear on the game plan." Id. Firepond's third quarter 10Q was drafted and filed according to Erich's suggested "plan." First Kugler Decl. Ex. 6 at 25.

In conjunction with the plan, Erich also notified Third Party Noteholders of the statement in Firepond's 10Q that "it will not meet the EBITDA covenant." First Dietz Aff. Ex. B at 7. He further represented that he had "been authorized by Firepond and FP Tech" to circulate a term sheet that proposed foreclosing on the Exchanged Notes and investing in a new, privately-held company. Id. Thereafter, having received no response from a major Third Party Noteholder about whether it was willing to foreclose or to sell its Exchanged Notes to FP Tech, Audrey informed board member Knuettel that they would "lob another email letting everyone know that Bankruptcy will be the next step." Id. Peary also assisted with FP Tech's efforts to purchase Exchanged Notes, asking Eric to let him know how he could help. Id. at 15. Erich assured him he was "in the game." Id. FP Tech ultimately purchased all $9,158,430 of Firepond's secured

debt for only $2,327,562.

Within a month after Firepond's 10Q filing and the orchestrated communications to Third Party Noteholders, FP Tech was able to acquire a sufficient ownership percentage of the aggregate value of the Exchange Notes to allow it to declare a default on the senior Exchanged Notes, remove Bank of New York as Collateral Agent, hire WJG to conduct a foreclosure sale, purchase Firepond's assets with a putative credit bid, and transfer Firepond's operative business to FP Tech affiliate FPX.

Thus, sufficient evidence exists to support a finding that the Spangenberg Defendants engaged in inequitable conduct that enriched FP Tech and harmed creditors. Accordingly, the Spangenberg Defendants' motion for summary  judgment is denied on the claim for equitable subordination.[9]

### 5.  Count V: Breach of Fiduciary Duty

The Trustee alleges Audrey and Peary breached their fiduciary duties of loyalty and good faith to Firepond by elevating their personal interests above those of the corporation and its shareholders.  Am. Compl. ¶¶ 246-49, 251-53.  The Trustee further alleges that the Spangenberg Defendants conspired with Audrey and Peary to breach their fiduciary duties.  Id.  ¶¶ 250-53.

---

[9] The Trustee also seeks to subordinate FP Tech's claims because FP Tech purchased the Exchange Notes at a time when Firepond was insolvent.  In seeking to subordinate the loans on this basis, the Trustee relies on cases involving shareholders who advanced loans to corporations while the corporations were insolvent.  See Pepper, 308 U.S. at 309-10 (stating advances by a controlling shareholder to an insolvent corporation will be subordinated to the claims of other creditors and treated as capital contributions).  Here, however, the loans at issue here were not made by FP Tech to Firepond.  Rather, Firepond had already incurred the loans, and FP Tech purchased them from the Third Party Noteholders.  Therefore, the Trustee's argument for subordinating FP Tech's loans on this basis is rejected.

The fiduciary duties imposed on corporate officers under Delaware law[10] include the duty of loyalty and the duty of good faith. Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993). The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." Id. The duty of good faith prohibits a fiduciary from "intentionally act[ing] with a purpose other than that of advancing the best interests of the corporation." In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 67 (Del. 2006).

The elements of a claim for aiding and abetting the breach of a fiduciary duty are: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." U.S. Bank Nat'l Ass'n v. Verizon Commc'n Inc., 817 F. Supp. 2d 934, 944 (N.D. Tex. 2011).

The Trustee has adduced sufficient evidence to raise a genuine issue of fact as to whether Audrey, who was both the chair of Firepond's board and the CEO of FP Tech, placed her interests above those of Firepond. As discussed in the preceding section, she was responsible for the statements in Firepond's 10Q, and arguably used those statements as leverage to further an alleged plan to eliminate the interests of Firepond's unsecured creditors and stockholders and transfer Firepond's assets to her newly-formed company. Similarly, Peary, who was receiving half of his salary from a Spangenberg entity and considered himself part of the "TechDev/CWC/Acclaim Financial team," may reasonably be found to have acted contrary to

---

[10] Fiduciary duty claims are governed by the law of the state of incorporation. Dunning v. Bush, 536 F.3d 879, 886 (8th Cir. 2008). Firepond is a Delaware corporation.

the best interests of Firepond.  While serving as Firepond's general counsel, he facilitated and provided "intel" for FP Tech's negotiation for and purchase of Firepond's secured debt, helped Erich identify reasons for default in the Exchange Notes, participated in the premature declarations of default, and assisted in the replacement of Bank of New York as Collateral Agent when Bank of New York refused to foreclose.

The Trustee's allegations that Erich conspired with Audrey and Peary to breach their fiduciary duties also survive the motion for summary judgment.  Erich's participation in the drafting of Firepond's 10Qs is evidence that he may have knowingly aided and abetted Audrey and Peary in breaching their duties.  Additionally, the claim that he encouraged Audrey to breach her fiduciary obligations to Firepond's stakeholders is supported by the email he sent to her upon learning the Third Party Noteholders may fight the foreclosure process.  Erich wrote: "have u ever seen that movie . . . . . play tough . . . u may get sued, but sooooo what . . . ."  First Dietz Aff. Ex. B at 27.  The email demonstrates that Erich knew Audrey's actions may result in liability to the Third Party Noteholders, but he nevertheless directed Audrey to follow his plan to acquire Firepond's assets.

In their Objection to the Bankruptcy Court's Summary Judgment Order, the Spangenberg Defendants argue the breach of fiduciary duty claim fails because Delaware law permits an officer of a corporation to acquire and enforce the corporation's secured debt.  Delaware law does recognize that "one who may be both a creditor and a fiduciary (*e.g.*, a director or controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights."  Odyssey Partners, L.P. v. Fleming Cos. Inc., No. 14770, 1996 WL 422377, at *3 (Del. Ch. July 24, 1996).  The rationale is the fiduciary

obligation does not limit the legal powers of a fiduciary when those powers are not "derive[d]

from the circumstances or conditions giving rise to the fiduciary obligation in the first instance."

Id.

Here, however, FP Tech's creditor rights and legal power to enforce those rights may

have "derive[d] from the circumstances or conditions giving rise to the fiduciary obligation."

Again, FP Tech's acquisition of the Exchange Notes may have been facilitated by the gratuitous

statements in Firepond's 10Q about Firepond's anticipated default, as well as the contrived

communications to Third Party Noteholders immediately following the 10Q filing.  Audrey and

Peary, as director and general counsel of Firepond, respectively, were responsible for the 10Q

statements and authorized the communications.  Less than a month after these events, three Third

Party Noteholders sold their Exchanged Notes to FP Tech, thereby providing FP Tech with

ownership of a sufficient percentage of the aggregate senior debt under the Exchanged Notes to

declare a default and remove the Collateral Agent that had refused to foreclose.  Thus, FP Tech's

creditor rights may have been derived through Audrey and Peary's misuse of their fiduciary

positions.  See Field v. Allyn, 457 A.2d 1089, 1099 (Del. Ch. 1983), aff'd, 467 A.2d 1274 (Del.

1983) (stating a director or corporate officer may not use their fiduciary position to benefit

personally or gain an advantage over others); Xperex Corp. v. Viasystems Tech. Corp., LLC, No.

20582-NC, 2004 WL 3053649, at *3 (Del. Ch. July 22, 2004) (denying summary judgment on

breach of fiduciary duty claim where ambiguity existed as to whether insider creditor's rights

were derived from circumstances giving rise to fiduciary obligation).

The Spangenberg Defendants also argue that the breach of fiduciary duty claim must fail

because the Trustee has not shown the unsecured creditors were injured by the foreclosure sale

and has not adduced evidence on which to base a reliable estimate of damages.  However, where

the duty of loyalty is breached, the "stringent requirements of causation and damages" are

loosened, and "[a]ny uncertainty in awarding damages is resolved against the wrongdoer."

Hampshire Grp., Ltd. v. Kuttner, No. 3607-VCS, 2010 WL 2739995, at *50 (Del. Ch. July 12,

2010); see also Gesoff v. IIC Indus., Inc., 902 A.2d 1130, 1154 (Del. Ch. 2006) ("[T]he court

can, and has in the past, awarded damages designed to eliminate the possibility of profit flowing

to defendants from the breach of the fiduciary relationship.").

Like the inequitable subordination claim, the time from which to measure damages is not

the date of the foreclosure sale, but rather the date the Defendants first breached their fiduciary

duties to Firepond.  Additionally, the value of Firepond's publicly-traded stock on the date of

breach may serve as a starting point for calculation of damages.  Thus, the breach of fiduciary

duty claim does not fail for want of damages and the summary judgment motion on the breach of

fiduciary duty claim is denied.

### 6.  Count VI: Conversion

The Trustee also alleges the Spangenberg Defendants and WJG converted Firepond's

assets, and that Peary conspired with them to do so.  Am. Compl. ¶¶ 254-57.  Minnesota law

defines conversion as an act of willful interference with another's personal property without

lawful justification or which is inconsistent with the rights of the person entitled to use, possess,

or own the property.  DLH, Inc. v. Russ, 566 N.W.2d 60, 71 (Minn. 1997); Larson v. Archer-

Daniels-Midland Co., Inc., 32 N.W.2d 649, 650 (Minn. 1948); Christensen v. Milbank Ins. Co.,

643 N.W.2d 639, 643 (Minn. Ct. App. 2002).  A transfer or disposition of property made with

the knowledge and consent of an owner is not conversion.  Halvorson v. Guerkink, 56 N.W.2d

793, 797 (Minn. 1953).

Here, the Trustee's conversion claim fails as to all Defendants because the unrebutted evidence of record is that Firepond had knowledge of and consented to the transfer of its property, and the terms of the Exchanged Notes provided legal justification for the foreclosure. In April 2008, Firepond knowingly consented to the grant of security interests in its assets as collateral for the obligations it owed under the Exchange Notes.  Firepond also knowingly consented to the provision in the Exchanged Notes that the failure to meet the specified minimum Consolidated EBITDA for the quarter ending December 31, 2008, would constitute default.  See Peary Aff. Ex. 13 at 9.  Firepond's 10Q filed with the SEC on February 4, 2009, shows Firepond failed to meet the specified minimum Consolidated EBITDA.  Third Kugler Decl. Ex. 4 at 21.  Eleven days before the sale, notice of the foreclosure sale was faxed to Firepond and its secured, unsecured, and potential creditors.  Gates Aff. Ex. F at 123-40.  Notice of the foreclosure sale was also published in the Wall Street Journal ten days before the sale.  Id. Ex. G at 141-42.  No one objected to the sale.  Therefore, the transfer of assets in the foreclosure sale was lawfully justified under the terms of the Exchanged Notes and occurred with Firepond's knowledge and consent.  Accordingly, summary judgment is granted to all Defendants on the Trustee's claim of conversion.

**D.  Nondispositive Orders**

### 1.  Order Granting Leave

Defendants also object to the Bankruptcy Court's Order allowing the Trustee to amend the Complaint.  The Order Granting Leave does not state a factual or legal basis for the ruling; thus, it will be reviewed de novo.

Under Federal Rule of Civil Procedure 15(a)(2), leave to amend should be "freely given when justice so requires."  A court may deny leave to amend where the amendment would be futile.  See Hammer v. City of Osage Beach, 318 F.3d 832, 844 (8th Cir. 2003).  A motion to amend is futile if the amended complaint would not survive a motion to dismiss.  Lunsford v. RBC Dain Rauscher, Inc., 590 F. Supp. 2d 1153, 1158 (D. Minn. 2008).  A complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

### a.  Punitive Damages

#### i.  Breach of Fiduciary Duty

As earlier stated, Delaware law governs the Trustee's fiduciary duty claim.  Punitive damages are not awarded for breach of fiduciary duty claims under Delaware law.  U.S. Bank Nat'l Ass'n., 817 F. Supp. 2d at 944; Adams v. Calvarese Farms Maint. Corp., No. 4262-VCP, 2010 WL 3944961, at *21 n.204 (Del. Ch. Sept. 17, 2010); Gesoff, 902 A.2d at 1154.  Therefore, the Trustee's motion to amend the Complaint to add a claim for punitive damages for breach of fiduciary duty is denied as futile.

#### ii.  Conversion

Having granted the Defendants summary judgment on the Trustee's conversion claim, the Trustee's motion to amend the Complaint to add a claim for punitive damages for conversion is also denied as futile.

### b. Alter Ego

The Spangenberg Defendants argue that amending the Complaint to add a claim for alter ego liability is futile because such a claim would not survive a summary judgment motion.  As stated above, the standard for determining whether a motion to amend is futile is whether the complaint can survive a motion to dismiss.  <u>Lunsford</u>, 590 F. Supp. 2d at 1158.  Nevertheless, even if the Court were to apply the more rigorous standard advocated by the Spangenberg Defendants, the alter ego claim would not be futile because the evidence raises a genuine dispute of fact as to whether the Spangenbergs and their corporations were alter egos of each other.

The Trustee alleges the corporate defendants, with the exception of WJG, are alter egos of each other and of Audrey and Erich, and that recovery of all damages jointly and severally from Audrey and Erich is appropriate.  Am. Compl. ¶¶ 280-81; p. 45 ¶¶ 11-12 ("Wherefore" section).

Under Texas law,[11] the alter ego doctrine applies to disregard the corporate fiction "when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." <u>Adams Offshore Ltd., v. OSA Int'l, LLC</u>, No. H-09-0465, 2011 WL 4625371, at *8 (S.D. Tex. Sept. 30, 2011) (quoting <u>Bollore S.A. v. Import Warehouse, Inc.</u>, 448 F.3d 317, 325 (5th Cir. 2006)) (quoting in turn <u>Castleberry v. Branscum</u>, 721 S.W.2d 270, 272 (Tex. 1986)).  The injustice to be prevented

---

[11] As the Spangenbergs' closely held entities are Texas corporations, Texas law applies. <u>See</u> <u>Kalb, Voorhis & Co. v. Am. Fin. Corp.</u>, 8 F.3d 130, 132 (2d Cir. 1993) (applying law of the state of incorporation to determine whether corporate form should be disregarded); <u>St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 562 F.2d 1040, 1052 (8th Cir. 1977) ("Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law expressly requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation.") (quotation omitted).

in alter ego cases "is that of leaving the plaintiff with an uncollectible judgment against the corporation, while allowing its alter ego to go free."  Mancorp, Inc. v. Culpepper, 836 S.W.2d 844, 846 (Tex. Ct. App. 1992).  The alter ego theory is based on the rationale that "if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect . . . creditors."  Wilson v. Davis, 305 S.W.3d 57, 69-70 (Tex. Ct. App. 2009) (internal quotation omitted).  Courts are generally "less reluctant to disregard the corporate entity in tort cases than in breach of contract cases."  Lucas v. Tex. Indus., Inc., 696 S.W.2d 372, 375 (Tex. 1984).

In determining whether to apply the alter ego doctrine, courts consider "the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership, and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes."  Castleberry, 721 S.W.2d at 272. The alter ego theory may also apply to corporate entities such as a parent and its subsidiary "where a corporation is organized and operated as a mere tool or business conduit of another corporation."  Adams, 2011 WL 4625371, at *9 (quoting Harwood Tire-Arlington, Inc. v. Young, 963 S.W.2d 881, 885 (Tex. Ct. App. 1998)).  In that instance, the alter ego doctrine will apply if such unity exists between the parent and subsidiary corporation that they are no longer separate and holding only one entity liable would result in injustice.  Adams, 2011 WL 4625371, at *9.

Here, the facts alleged and evidence adduced by the Trustee raise an issue of fact as to whether Audrey and Erich and their closely held corporations named as defendants in this case

48

are alter egos of each other.  First, there is evidence that the corporate defendants disregarded corporate formalities.  For example, FP Tech, upon purchasing Firepond's assets at the foreclosure sale, never formally transferred those assets to FPX.  Instead, the assets simply went directly from Firepond to FPX.  This lack of documentation suggests Audrey and Erich used FP Tech as a corporate shell through which to acquire Firepond's assets and transfer them to their privately-held entity, FPX.  Similarly, there is no evidence that Erich or NMPP ever billed for the advisory services provided to FP Tech.

The Spangenbergs also treated the corporations interchangeably at times, suggesting a unity among the corporations and their existence as mere conduits for each other and for Erich and Audrey.  For example, in FP Tech's December 15, 2008 letter drafted by Erich, signed by Audrey, and sent to Firepond, Audrey states that AFG, rather than FP Tech, owned Firepond's secured debt and planned to foreclose.  See First Dietz Aff. Ex. B at 23.  Erich's statement that the letter could be sent on either FP Tech or AFG letterhead further evinces the lack of corporate formalities and the unity between these two corporations.  See id.

Not only were AFG and FP Tech treated interchangeably, there is also evidence of unity between AFG and its subsidiary, TechDev.  For example, Peary identifies himself as a "part of the TechDev/CWC/Acclaim Financial team," even though Peary was apparently being paid by CWC for the purported objective of achieving a positive cash flow for Firepond.  Second Dietz Aff. Ex. C.

There is also evidence that Erich and/or NMPP acted interchangeably with FP Tech or used FP Tech as a mere tool.  When Erich was informed that a Third Party Noteholder referred to as "Radcliffe" was thinking of resisting FP Tech's foreclosure efforts, Erich responded, "F

them    . . . I will rock their world," and "I have more on [sic] my pocket than R . . . I beg them

to get in the ring with me."  He also told Audrey in February 2009, that: "Once I saw the bill . . .

that is why I ended Firepond."  Second Dietz Aff. Ex. OO at 1.  Erich may have also been acting

for himself or on behalf of NMPP when he simultaneously served as an advisor to Firepond in

drafting its 10Qs and an advisor to FP Tech in declaring defaults based on the 10Qs.  To be sure,

an advisory firm's dual representation of two directly adverse clients on a conflicting matter

would be highly unusual and patently unethical.

    Additional evidence of the use of FP Tech as a shell is FP Tech's dependence on

TechDev, its parent company, for funds to purchase the Exchanged Notes.  See Second Dietz

Aff. Ex. BBB at 15; Lucas, 696 S.W.2d at 375 ("The financial strength or weakness of the

subsidiary is . . . an important consideration in determining whether the subsidiary is merely a

shell through which the parent is conducting its business without taking any of the risks for

liabilities incurred.").

    There is no dispute that Audrey and Erich maintain almost complete financial ownership

and control over the defendant corporations.  Audrey owns 99% of AFG, which owns 100% of

TechDev, which owns 99.5% of FP Tech, which owns 100% of FPX.  Erich owns 100% of

NMPP.  Audrey is the sole manager of AFG, FP Tech, and FPX.  Erich is the sole manager of

NMPP.

    Assuming unity is found to exist among the Spangenbergs and their corporations,

injustice would result if the Trustee ultimately were to secure a judgment against a Spangenberg

entity and the Spangenbergs or their other corporations were allowed to escape liability by using

the corporate form as a shield.

Thus, the total dealings among the Spangenbergs and the corporations they own and control raise a fact issue on whether such unity exists among them that injustice would result if the alter ego doctrine were not applied.  Accordingly, the alter ego claim is not futile and the Trustee's motion to amend the complaint to add this claim is granted.

### 2.  Order for Production of Documents

The Spangenberg Defendants further object to the Bankruptcy Court's Order determining that certain documents prepared by Peary are not subject to the attorney-client privilege and may be freely disclosed.  The documents at issue address whether, at the time of the foreclosure sale, FP Tech was in possession of replacement Notes for the Exchanged Notes it had purchased from the Third Party Noteholders.  As discussed above, the issuance of replacement Notes is not determinative of whether FP Tech owned the Exchanged Notes at the time of the foreclosure sale.  Therefore, the objection to the Order is moot.

### IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that**:**

1.      The Objection of Defendant Walter J. Gates, III, P.A. [Docket No. 12, Attach. 16] is **SUSTAINED**;

2.      The Objection of the remaining Defendants [Docket No. 12, Attach. 17] is **SUSTAINED IN PART** and **OVERRULED IN PART**;

3.      The findings of fact and conclusions of law in the Bankruptcy Court's Order Denying Motions for Summary Judgment [Docket No. 12, Attach. 12] are **MODIFIED** as described above;

4.      The Summary Judgment Motion of Defendant Walter J. Gates, III, P.A. [Docket

No. 10, Attach. 11] is **GRANTED**;

5.       Defendant Walter J. Gates, III, P.A. is **DISMISSED** as a defendant in this case;

6.      The Summary Judgment Motion of Defendants Erich L. Spangenberg; Audrey E.

Spangenberg; Christian Spangenberg; Stephen Peary; FPX, LLC; FP Tech

Holdings, LLC; TechDev Holdings, LLC; Acclaim Financial Group, LLC; and

NMPP, Inc.  [Docket No. 10, Attach. 12] is **GRANTED IN PART** and **DENIED**

**IN PART**;

7.      Christian Spangenberg is **DISMISSED** as a defendant in this case;

8.      The findings of fact and conclusions of law in the Bankruptcy Court's Order

Granting Leave to Amend Complaint [Docket No. 12, Attach. 11] are

**MODIFIED** as described above; and

9.      The Bankruptcy Court's Order to File Document Under Seal and Determination

Regarding Attorney-Client Privilege [Docket No. 12, Attach. 10] is **VACATED**

as moot.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 29, 2013.